# LATHROP v. FARGO-MOORHEAD STREET RAILWAY COMPANY.

### (136 N. W. 88.)

**Trial — instructions — jury — its duties.**

1. After the jury in this case had been out nearly twenty-four hours, and had reported that they were unable to agree, the court, over the objection of the appellant, instructed the members of the jury as to their duties to make an effort to agree, such instruction being too long to include in this syllabus, and required them to give the case further consideration. After considering it for about two hours longer, they agreed. *Held*, that, in determining how long to hold a jury for an agreement, the trial court must exercise a wide range of discretion, depending largely upon the number of facts to be found, and whether they are simple or complicated; and that the charge of the court was proper, under the circumstances of this case.

**Trial — special verdict — interrogatories to jury.**

2. At the request of the respondent, a special verdict was required of the jury, but before delivering the interrogatories to the jury the court answered certain of the questions, over the objection of the appellant. *Held*, that as there was no substantial conflict in the evidence on the subjects of such interrogatories, this action of the court was proper.

**Appeal and error — findings — review — evidence.**

3. The evidence was in direct conflict as to whether, at the time the accident in question occurred, plaintiff was driving north or south, across defendant's railway track. Among the questions submitted were certain questions framed with reference to the negligence of the defendant, if the jury should find he was going south; and others in case it should find he was going north. Two of these questions were answered by the court, but such answers were predicated upon the possibility of the jury finding that the plaintiff was driving north, when in fact they found that the plaintiff was driving south. *Held,* that it was nonprejudicial to the plaintiff.

**Street railways— operation — injuries — contributory negligence.**

4. Following Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225, it is *held,* that as a general rule the question is whether the motorman did see, or could have seen, the plaintiff in a place of danger in time to have avoided the accident, by the use of ordinary or reasonable care, or a question to that effect; but that the state of the evidence and the theory on which this case was tried made it unnecessary to determine whether the motorman could have seen plaintiff in time.

**Trial — verdict.**

5. The answers to the interrogatories contained in a special verdict must be -consistent with each other, or it will be set aside.

**Trial — verdict.**

6. The Code requires a special verdict to present conclusions of fact as established by the evidence, and not the evidence to prove them. Courts should so frame the interrogatories of a special verdict as to comply with this provision.

**Trial — special verdict — instructions — charge to jury.**

7. When a special verdict is required, courts should not charge the jury on the general law of the case further than is necessary to assist in answering each interrogatory propounded.


Opinion filed March 26, 1912.   Rehearing denied May 2, 1912.


Appeal by plaintiff from an order of the District Court for Cass County, *Pollock,* J., denying his motion for judgment notwithstanding the verdict, or for a new trial in an action to recover damages for injuries received in a collision.

Reversed.

## Statement of Facts.

Appellant brought this action against the Fargo-Moorhead Street Railway Company, a corporation, running a street car line in the cities of Fargo, North Dakota, and Moorhead, Minnesota, to recover for injuries received in a collision with one of respondent's cars. At the conclusion of the trial the court, at respondent's request, submitted to the jury a special verdict, consisting of twenty-two questions. For a proper understanding of the case, we abridge the facts. Front street runs east and west through the city of Fargo. The numbered streets in that city run north and south, commencing to number next the Red river, on the east edge of the city. The street car line follows Fourth street north to Front street. At the point where it strikes Front street, looking north, it turns to the west and runs along the center of Front street to Broadway, or Sixth street, 600 feet, plus the width of Fifth street,—probably about 80 feet. At Broadway it turns a sharp corner to the north. On the north side of Front street, and about 100 feet from Broadway, is a loading platform of the M. warehouse, facing south. On the day in question the plaintiff drove his horses, attached to an express wagon, up to this loading platform and hitched them thereto, with the horses facing east, some 40 or 50 feet north of the street car track. He transacted his business and unhitched his team. When he got into his wagon, facing east, he observed that no street car was in sight between there and Fourth street. He thereupon turned his team southwest,—he testifies a little more south than west—and drove across the track, as found by the jury. He was sitting in the front part of the wagon, and as he was on the track he looked over his shoulder and saw a car coming from the east, about to strike him. He was unable to clear his wagon, the car struck it, and injured him, his team, and the wagon; and this action is the result.

The questions in the special verdict and their answers, so far as material to the determination of this appeal, are as follows:

"1. At what rate of speed was defendant's car moving at the time of the accident? A. 8 miles.

"2. At what rate of speed was the plaintiff driving his team at the time of the accident? A. 2 miles.

"3. At the time of the collision, which general direction was the plaintiff's team going, north or south? A. South.

"4. After the car left Fifth street, going west, and before the accident occurred, was the bell or gong of defendant's car sounded? A. Yes.

"5. Was the motorman guilty of any want of ordinary care in the operation of his car at the time of the accident? A. Yes.

"6. If you answer the last question, yes, then was such want of ordinary care the proximate cause of the injury to the plaintiff? A. Yes.

"7. Did the plaintiff, before leaving the Magill warehouse, where his horses were tied, look to see if a car was approaching from either direction? A. Yes.

"8. Did the plaintiff look east after leaving the Magill warehouse, and before he drove southwest (if you so find) upon the street car tracks, in front of the approaching car? A. No.

"9. How far did the plaintiff drive southwest (if you so find) after leaving the Magill warehouse, before he drove upon the street railway tracks? A. 50 to 60 feet.

"10. If you have answered question No. 3 that plaintiff was going north, then did plaintiff look to see if a car was approaching, before he attempted to cross the track? A. No.

"11. At the time mentioned in question No. 10, did plaintiff listen to catch the sound of an approaching car? A. No.

"12. Could the plaintiff, in the exercise of ordinary care and prudence, have seen the approaching car in time to have avoided the accident? A. Yes.

"13. Was the plaintiff guilty of any want of ordinary care which contributed to produce the injury complained of? A. Yes.

"14. After the motorman saw the plaintiff drive on to the track, did he, in the exercise of ordinary care, have time to stop the car and avoid the accident? A. No.

"15. Did the plaintiff drive upon or near the track of the defendant street car company so far ahead of the car in question that the motorman in charge of such car, after seeing him thus exposed to danger, might have avoided injuring him by the exercise of ordinary or reasonable care? A. No.

"16. Was the car of the defendant railway running at a dangerous

rate of speed, taking into consideration all the circumstances, at the time of the accident or collision? A. Yes."

"22. What amount of damages has the plaintiff sustained by reason of the acts complained of? A. $1,000."

The jury retired at 3:30, p. m., December 22, 1910. At 3 o'clock, p. m., December 23, it sent a written statement to the court, to the effect that the jurors were absolutely unable to agree; that the several ballots taken were the same on every essential question. Whereupon the court presented to the counsel for both parties a proposed instruction to the jury, and inquired of counsel for plaintiff if he had any exceptions thereto. Thereupon plaintiff's counsel objected and excepted to such instruction being given, "because it is an invasion of the province of the jury, and in view of the situation amounts to coercion of the jury." The remainder of the objection is not insisted upon here. Counsel for defendant made no objection. Whereupon the court read to the jury the following instruction:—

"Gentlemen of the Jury: The only mode provided by our Constitution and laws for deciding questions of fact is by the verdict of the jury. In a large proportion of cases, and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the opinions of his fellows, yet in order to bring twelve minds to a unanimous result you must examine the questions submitted to you with candor and a proper regard and deference to the opinions of each other. You should consider that you are selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to twelve men more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view it is your duty to decide the case if you can conscientiously do so.

"In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. In the present case, the burden of proof is upon the plaintiff to show all the material allegations of his complaint by a fair preponderance of the evidence, and upon the defendant to show contributory negligence, if any existed.

"In conferring together you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the large number of your panel are for the plaintiff, a dissenting juror should consider whether doubts in his mind as to the correctness of their conclusions are reasonable in view of the fact that doubts which you may have make no impression upon the minds of other men equally honest, equally intelligent with yourselves, and who have heard the same evidence with the same attention, with an equal desire to arrive at the truth and under the sanction of the same oath.

"And, on the other hand, if a majority are for the defendant, the minority ought to seriously ask themselves whether they may not be reasonable and ought to doubt the correctness of their judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows."

At 5 o'clock, P. M., on December 23, the jury reported that they had agreed; whereupon the verdict, to which reference has been made, was returned and received, and the jury discharged. Thereupon counsel for defendant submitted a motion to the court for an order for judgment in defendant's favor upon said verdict, to which plaintiff objected upon the ground that it was inconsistent in itself. Whereupon the court granted the motion of the defendant and entered judgment in its favor. Subsequently the plaintiff submitted a motion for judgment notwithstanding the verdict, or for a new trial. From an order denying such motion, and from the judgment entered, this appeal is taken.

*M. A. Hildreth,* for appellant.
*Stambaugh & Fowler,* for respondent.

SPALDING, Ch. J. (after stating the facts). Twenty-three assignments of error are contained in appellant's brief, but from our view of the case only a few of them require consideration.

1. The giving of the additional charge quoted above is assigned as error. In the nature of things the trial court must be permitted to exercise a very wide range of discretion in determining how long a jury should be held for the purpose of securing an agreement. The jury

passes upon the facts, and it cannot be presumed that in any case wherein the facts are, to any considerable degree, complicated, twelve men will view them from the start in the same light or at once reach the same conclusions in every particular. They are permitted to retire from the court room, instead of being required to take a vote at once, in contemplation of their not being able to immediately agree on all the material issues, and for the purpose of permitting them to review the evidence and present arguments, and, if possible, convince each other. In a case involving as many facts as the one before us, twelve intelligent and independent-minded men naturally find more difficulty in agreeing than in a simple case, involving only a few facts; and the trial court would, therefore, be warranted in keeping the jury out longer than in a simple case. He would likewise be justified in more fully explaining the duties of the respective jurors in the premises than might otherwise be necessary.

The charge referred to was the charge given in Com. v. Tuey, 8 Cush. 1, only changed to adapt it to a civil case, and was approved in State v. Smith, 49 Conn. 376, and in Allen v. United States, 164 U. S. 492, 41 L. ed. 528, 17 Sup. Ct. Rep. 154; and we see no reason for disapproving it. It did not go to the extent of indicating the opinion of the court on the facts, nor can it have left the impression upon any juror that he should surrender his conscientious convictions to secure an agreement. The jurors are supposed to be men of average intelligence at least, capable of understanding the meaning of the court when he gives them instructions; and to justify reversal by reason of an explanation of their duties with reference to listening to and considering the opinions of their associates should require a much more marked indication that the minority should yield than we find in the charge complained of.

The Supreme Court of the United States, in Allen v. United States, supra, said:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that the opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large

majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or that he should close his ears to the arguments of men who are equally honest and intelligent as himself." See also Delmonica Hotel Co. v. Smith, 112 Iowa, 659, 84 N. W. 906.

2. Error is assigned because the court wrote the answers to the 8th, 10th, and 11th interrogatories. We think the court was fully justified in doing so. As to number 8, the printed record containing the evidence in narrative form would seem to indicate that on direct examination appellant testified that he looked east after he turned his team around and before he reached the track, but on cross-examination he repeatedly, clearly, and unequivocally denies having done so. We think a fair construction of his testimony is that his statement that he looked east relates to that act at the time he started turning his horses, and, so construed, there is no conflict in the record on this quesion.

There was a direct conflict in the testimony as to whether the plaintiff was driving south or north when the accident occurred. The jury passed upon this, and found that he was driving south; but of course the questions were prepared before findings were made, and certain questions were appropriate to and dependent upon their answer to question No. 3, which required an answer as to what general direction he was going,—whether north or south.

The purpose of question No. 10 was to ascertain whether the plaintiff looked for a car coming from the east before he attempted to cross the track, in case it was found that he was going north, and on his own testimony, to which we have referred, the court was warranted in answering it, "No;" that is to say, that he did not look after turning his team, even if going north at the time of the accident. The same may be said regarding the answer to question No. 11, which related to his listening. We find no error on the part of the court in answering this question.

3. We now come to a more difficult proposition. After careful consideration, we have reached the conclusion that the answers to certain material questions are inconsistent, and present such a conflict that the judgment cannot be sustained. In answer to question No. 12, the jury found that the plaintiff, if in the exercise of ordinary care and prudence,

could have seen the approaching car in time to have avoided the accident, and it answered "Yes" to question No. 13, as to his want of ordinary care contributing to produce the injury. It also found, in answer to question No. 14, that the motorman did not have time to stop the car and avoid the accident, in the exercise of ordinary care, after he saw the plaintiff drive on to the track; and in answer to question No. 15, that the plaintiff did not drive upon or near the track so far ahead of the car that the motorman, after seeing him exposed to danger, might, by the exercise of ordinary or reasonable care, have avoided injuring him.

It is apparent that interrogatories No. 14 and No. 15 and their answers, if broad enough to cover the negligence of the defendant, if any, are in direct conflict and inconsistent with interrogatory No. 5 and its answer. In Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225, this court recently announced that the rule in this state includes the question as to whether the motorman could have seen the plaintiff in a place of danger in time to have avoided the accident, by the use of ordinary and reasonable care. As the plaintiff made no objections to the form of the interrogatories or to their substance, he would not be in position to assign error because of the insufficiency of these questions, if they were insufficient; but after a careful examination of the record we agree with respondent that, on the state of the record, at the close of the trial, they were sufficient. It had not been contended that the plaintiff was in a place of danger for any considerable time; but that his danger commenced with his suddenly turning upon the track of the defendant, and that the motorman could not have anticipated his danger, even if seeing him, until he actually turned upon the track, or came so near to it as to indicate that he was intending to cross it. The defendant had tried its case on the theory based upon the testimony of the motorman, the conductor, and several other witnesses, that the plaintiff was driving east on the south side of the track, but behind a covered wagon which totally concealed him and his rig from the view of the motorman, until he suddenly turned from behind the wagon on to the track. The plaintiff and one witness testified that he was driving, as the jury found, more south than west; and it is apparent that the court, in submitting the last of these questions, framed them with reference to the contention

of the defendant, and that we are not called upon to take into consideration the question of what the motorman might have seen.

As we understand the law applicable to this case it may be stated in logical form as follows: The first question is, Was the defendant guilty of negligence? The second, if the defendant was negligent, was the plaintiff also negligent, and did his negligence contribute to the injury inflicted on him? When the jury answers both these questions in the affirmative, if nothing further is shown, the result is in favor of the defendant; but after the negligence of both parties is shown, the further question may arise; namely, the negligence of which party was the proximate cause of the injury? And when it is found that the negligence of the defendant was the proximate cause, and that of the plaintiff the remote cause, the plaintiff is entitled to recover. But in the case at bar the jury has found by its answers to two interrogatories that the defendant was not guilty of any negligence, and by its equally specific answer to another interrogatory has found that it was guilty of negligence. These findings necessarily leave the court utterly in ignorance as to the negligence of the defendant, and powerless to enter a judgment thereon.

It is well settled that when a special verdict is submitted and returned, its different parts must be consistent and without material conflict, or it will be set aside. McBride v. Union P. R. Co. 3 Wyo. 247, 21 Pac. 687; Carman v. Ross, 64 Cal. 249, 29 Pac. 510; Murray v. Abbot, 61 Wis. 198, 20 N. W. 910; Terre Haute & I. R. Co. v. Mason, 148 Ind. 578, 46 N. E. 332; Day v. Webb, 28 Conn. 140; Haas v. Chicago & N. W. R. Co. 41 Wis. 51; Bach v. Parmely, 35 Wis. 238; Deisenrieter v. Kraus-Merkel Malting Co. 97 Wis. 279, 72 N. W. 735; Clementson, Special Verdicts, 237.

As stated in the McBride Case, supra, "to strike out one and give effect to the other would be to make a new verdict, which the court has no power to do. Neither are we at liberty to go behind the findings and resort to the evidence to sustain the verdict, for the effect would be the same."

4. It is also contended that several of the answers to interrogatories are unsupported by the evidence. It is unnecessary to enter into details on this subject, as we have examined the record and find evidence supporting each finding so complained of.

5. This court having so recently passed upon nearly all phases of the law applicable to cases of this character, we deem it unnecessary to enter upon a discussion of the errors assigned as to portions of the charge to the jury.

6. There are certain phases of this case which are not adverted to in the briefs, but in view of another trial we briefly call attention to them. The inconsistency between some of the evidence and some of the findings is important. The motorman testifies that he did not see the plaintiff until within a very few feet of him, 8 to 12, say, when he turned onto the track. The jury found that he was driving south. Now a team of horses and an express wagon must cover a space of at least 18 feet in length. If, as the jury found, the car was going four times as fast as the team, the car must have passed over a distance of about 72 feet between the time the horses reached the nearest rail of the track and the accident. According to the testimony relating to the distance in which the car could have been stopped, the motorman had more than ample time in which to stop it after he could have seen that plaintiff was crossing the track. On the other hand, while the plaintiff was driving 60 feet, from the warehouse to the track, 60 feet being the greatest distance found, the car would travel only 240 feet, at the speed found by the jury. This would have placed it less than half way to Fourth street and in plain view of the plaintiff when he started south, and if going faster than found by the jury, but at any probable rate of speed, the car must have been between the point of the accident and Fourth street. If it were running twice as fast as found by the jury, or 16 miles an hour, it would still have been some distance west of Fourth street. To have placed it outside the range of vision of the plaintiff when he started to drive south, it must have been running 20 to 25 miles an hour, without making allowance for its slowing up to get around the corner of Fourth and Front streets. It would thus appear that the plaintiff either did not look at all, or that he is wholly mistaken when he says there was no car in sight.

Section 7033, Rev. Codes, 1905, defines a special verdict as that by which a jury find the facts only, leaving the judgment to the court, and requires that it present the conclusions of fact as established by the evidence, and not the evidence to prove them; and that these conclusions of fact must be so presented that nothing shall remain to the court but

to draw from them conclusions of law. Section 7034 requires the court, at or before the close of the testimony, and before any argument to the jury is made or waived, upon request of a party, to direct the jury to find a special verdict, and gives directions concerning the preparation of the questions which are required to admit of direct answer. This statute is substantially the same as that of Wisconsin on this subject, and differs from the statutes of most of the states.

Several of the interrogatories propounded to the jury are not in conformity with the statute, but required the jury to find evidential facts rather than conclusions of fact as established by the evidence. Russell v. Meyer, 7 N. D. 335, 47 L.R.A. 637, 75 N. W. 262.

When a special verdict is required, courts should not charge on the general law of the case any further than is necessary to assist the jury in answering each interrogatory propounded. For discussion of the subject, see Morrison v. Lee, 13 N. D. 591, 102 N. W. 223; Schrunk v. St. Joseph, 120 Wis. 223, 97 N. W. 946; Mauch v. Hartford, 112 Wis. 40, 87 N. W. 816.

The judgment of the trial court is reversed, and a new trial will be had.